# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

ANN D. WESSBERG,

                              Civil No. 22-94 (JRT/DLM)

               Plaintiff,

v.

                         **FINDINGS OF FACT, CONCLUSIONS OF**

UNUM LIFE INSURANCE COMPANY        **LAW, AND ORDER FOR JUDGMENT**
OF AMERICA,

               Defendant.

---

Elizabeth S. Wright and Christopher M. Daniels, **PARKER DANIELS KIBORT LLC**, 123 North Third Street, Suite 888, Minneapolis, MN 55401; Michael J. Rothman, **ROTHMAN LLC**, 80 South Eighth Street, Suite 900, Minneapolis, MN 55402, for Plaintiff.

Terrance J. Wagener and Jake Elrich, **MESSERLI & KRAMER P.A.**, 100 South Fifth Street, Suite 1400, Minneapolis, MN 55402, for Defendant.

In October 2018, Plaintiff Ann Wessberg was diagnosed with bilateral invasive breast cancer. This diagnosis was the beginning of a long journey for Wessberg—one that included radiation and chemotherapy treatments, surgeries, and psychiatric and cognitive diagnoses. Wessberg made a claim for long-term disability benefits ("LTD benefits") under her employer's Policy in November 2018. Defendant Unum Life Insurance Company of America ("Unum"), the administrator of the Policy, found Wessberg was disabled because of her breast cancer diagnosis, approved Wessberg's LTD claim, and began issuing her LTD benefits in March 2019.

Unum reversed course in July 2020 when it decided Wessberg was not disabled, closed Wessberg's claim, and discontinued her LTD benefits.  Over the next year-and-a-half, Wessberg provided Unum with hundreds of pages of additional medical records and information, to no avail.  In April 2021, Wessberg formally appealed Unum's decision, which Unum denied.

Wessberg now brings this action against Unum, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., alleging that Unum improperly terminated her LTD benefits.  Based on the Administrative Record, Wessberg seeks an order reinstating her LTD benefits, and Unum seeks an order affirming its decision.

After carefully considering the entire record and arguments, the Court will find that Unum improperly terminated Wessberg's LTD benefits.  Accordingly, the Court will order Unum to reinstate Wessberg's LTD benefits retroactively to the date of termination, resume paying Wessberg ongoing LTD benefits, and award Wessberg reasonable attorney fees and costs and prejudgment interest.  Before ordering a specific amount of fees or prejudgment interest, however, the Court will require Wessberg to file a supportive affidavit and will order additional briefing from the parties on the proper amount of prejudgment interest.

**FINDINGS OF FACT**[1]

1.      The Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

2.      To the extent the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

## I.      THE PARTIES

3.      Ann Wessberg is a resident of Minnesota.  (Compl. ¶ 3, Jan. 18, 2022, Docket No. 1.)

4.      Unum is an insurance company that is licensed to do business in Minnesota. (Compl. ¶ 4.)

5.      Wessberg's employer, Fredrikson & Byron, P.A. ("Fredrikson") provided group long-term disability insurance plans governed by ERISA to its employees—including Wessberg—through Unum.  (AR 199–204.)  Fredrikson & Byron is otherwise referred to as the Policyholder.  (AR 231.)

---

[1] The parties submitted a 4860-page administrative record Unum developed to evaluate Wessberg's claim for long-term disability benefits.  (Decl. of Katherine Durrell, Mar. 8, 2023, Docket No. 47.)  Each page is stamped in the bottom right corner with UA-CL-LTD-XXXXXX with XXXXXX representing the page number.  For clarity, the Court cites to "AR" then the page number when citing the administrative record.  For example, UA-CL-LTD-000104 is (AR 104.)

Although the Court reviewed the entire administrative record, these Findings of Fact do not exhaustively repeat every fact in the record, instead focusing on the portions of the record that it found most important for the analysis of Wessberg's claim.  The omission of a fact in the record does not mean it was not considered.

## II.   UNUM'S LONG-TERM DISABILITY POLICY PROVISIONS

6.     The long-term disability policy ("Policy") defines terms and explains how to determine if someone is disabled under the plan.

7.     Under the Policy, an individual is disabled from their regular occupation if, as "a result of sickness, injury, pregnancy, substance abuse or mental illness, you are unable to perform with reasonable continuity one of the material and substantial duties of your regular occupation."  (AR 214.)

8.     An individual is considered "part-time" if they are able to work and earn between 20% and 80% of their indexed monthly earnings.  (AR 231.)

9.     An individual is considered "disabled and working" if, due to "sickness, injury, pregnancy, substance abuse or mental illness, you are unable to earn 80% or more of your indexed monthly earnings, in your occupation." (AR 214.)

10.     Indexed monthly earnings are "monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index."  (AR 230.)

11.     Regular Occupation is defined as:

> any employment, business, trade, profession, calling or vocation that involves material and substantial duties of the same general character as the occupation you are regularly performing for your Employer when disability begins. In determining your regular occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the local economy. If your regular occupation involves the rendering of professional services and you are

required to have a professional or occupational license in order to work, your regular occupation is as broad as the scope of your license.

(AR 232.)

12.    Material and Substantial Duties are defined as:

the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.

(AR 231.)

13.    "Sickness" is defined as "an illness or disease. Disability must begin while you are covered under the plan."  (AR 232.)

14.    To prove their claim, the individual must show:

- the date your disability began;
- the existence and cause of your sickness or injury;
- that your sickness or injury causes you to have limitations on your functioning and restrictions on your activities preventing you from performing the material and substantial duties of your regular occupation;
- that you are under the regular care of a physician;
- the name and address of any hospital or institution where you received treatment, including all attending physicians; and
- the appropriate documentation of your monthly earnings, any disability earnings, and any deductible sources of income.

(AR 205.)

15.    Unum may request that claimants "send periodic proof of your claim. This proof, provided at your expense, must be received within 45 days of a request by [Unum]."  (AR 205.)  Unum may also, in some cases, require claimants "to give Unum

authorization to obtain additional medical information, or proof of continuing disability."
(AR 205.)

16.     The Policy permits Unum to require a claimant to be evaluated by a medical
practitioner or vocational expert of its choosing "as often as it is reasonable to do so."
(AR 206.)

17.     Once Unum determines that someone is disabled, the claimant continues
to receive benefits until, among other circumstances, "the date you are no longer disabled
under the terms of the plan" or "the date you fail to submit proof of continuing disability."
(AR 221.)

18.     The Policy establishes a procedure for appealing Unum's adverse benefit
determination.  (AR 237.)  A claimant can appeal an adverse benefit determination by
submitting "written comments, documents, or other information."  (AR 237.)  Unum "will
take into account all new information, whether or not presented or available at [Unum's]
initial determination.  No deference will be afforded to the initial determination."  (AR
237.)

### III.    WESSBERG'S OCCUPATION

19.     Wessberg has been an attorney at Fredrikson since 2016.  (AR 1166–68.)
She is a shareholder at Fredrikson and previously served as the firm's department head
of the Trademark and Copyright practice group.  (AR 1166.)

20.     Prior to Wessberg's disability she was working around 60 hours per week.
(AR 1337.)

21.     Wessberg's job classification is "Attorney" under the *Dictionary of Occupational Titles*, Fourth Edition, United States Department of Labor Employment Training Administration (Revised 1991) ("e-DOT").  (AR 537–38.)

22.     e-Dot describes the physical requirements of an attorney as:

> Sedentary Work: Exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects. Sedentary work involves sitting most of the time but may involve walking or standing for brief periods of time.
> Frequent: talking, hearing
> Occasional: reaching, handling, fingering keyboarding

(AR 537–38.)

23.     e-Dot describes the cognitive demands of an attorney as: "advising, consulting, litigating and performing legal work or trial work, and carr[ying] out the legal processes necessary to effect the rights, privileges, and obligations of the organization."  (AR 537.)

## IV.   WESSBERG'S ILLNESS AND APPROVAL OF LONG-TERM DISABILITY BENEFITS

24.     In October 2018, Wessberg was diagnosed with bilateral invasive breast cancer.  (AR 1707.)  As a result, Wessberg underwent chemotherapy and radiation treatment, a bilateral mastectomy, and bilateral breast reconstruction surgery.  (AR 591, 1712, 2413.)

25.     On January 30, 2019, Wessberg submitted a claim for LTD benefits through Unum.  (AR 129–32.)  Wessberg included an Attending Physician Statement by her oncologist, Michaela Tsai, M.D.  (AR 188–92.)  Dr. Tsai's statement indicated that until

June 22, 2019, Wessberg could work only at a reduced schedule, as she was receiving ongoing treatment and recovering from chemotherapy.  (AR 190.)

26.     Unum approved Wessberg's claim for LTD benefits, finding Wessberg was disabled and unable to work as of November 19, 2018.  (AR 314–15.)  Specifically, Unum determined Wessberg was disabled because Wessberg was "unable to perform the material and substantial duties of [her] regular occupation due to [her] medical condition of right breast cancer."  (AR 315.)  Accordingly, Unum began issuing LTD benefits effective February 17, 2019.  (AR 314–15.)

## V.     WESSBERG'S DISABILITY IN 2019 AND RECONSIDERATION OF LONG-TERM DISABILITY BENEFITS

27.     Wessberg returned to work part-time—two days per week—from mid-January 2019 through May 2019.  (AR 196, 522.)  From February through May, Wessberg worked approximately 50 hours.  (AR 399, 541–42.)  At this time, Wessberg was still undergoing chemotherapy and experiencing dizziness and fatigue.  (AR 196, 425, 735.)  In May 2019, Wessberg completed chemotherapy treatment and began radiation therapy, followed by two more reconstructive surgeries.  (AR 723–24, 1350, 1470, 1442–43, 1471.)

28.     Starting in at least April 2019 and continuing in July 2019, Wessberg consistently reported to her oncology providers that she was experiencing vertigo/dizziness and fatigue.  (AR 735, 741, 1461–67.)  Concerned for Wessberg, Dr. Tsai, whom Wessberg primarily saw, ordered a CT and an echocardiogram.  (AR 733.)  Both test results were normal.  (AR 731–32, 4344–45.)

29.     In May 2019, Wessberg began psychiatric treatment with Dr. Berger for anxiety and depression in connection with her cancer treatment. (AR 2413–15.) During treatment, Wessberg consistently reported trouble with concentration and memory, fatigue, decreased stamina, and worsening of coherent thoughts. (AR 4291–93, 4321–23, 4359–62.) On August 6, 2019, Dr. Berger reported that Wessberg was unable to work as an attorney because of Wessberg's reported mental and cognitive difficulties. (AR 4359–62.)

30.     Unum began re-evaluating Wessberg's disability in July 2019. Unum's first step was to obtain a vocational assessment of Wessberg's occupation from a vocational consultant. (AR 537–38.) Using e-DOT, the vocational consultant identified Wessberg's occupation as "Attorney." *See supra* Section III ¶¶ 21–23. Unum then sent the vocational assessment to Dr. Tsai and Dr. Berger, asking for their opinions on whether Wessberg could perform the occupation demands described in the vocational assessment full-time. (AR 546–47, 583–84.) The vocational assessment sent to the providers, however, did not include the cognitive requirements, only the physical requirements. (AR 546–47, 583–84.)

31.     Dr. Tsai responded, "provider does not assess," and "if these things would need to be assessed it would need to be done by a physical therapy or occupational provider. Our disability is done from a chemotherapy/treatment perspective." (AR 552–53.) Dr. Berger responded that Wessberg is still depressed, and he has no idea when she

can return to work, but hopefully in the next three months.  (AR 587.)  Dr. Berger also submitted his treatment notes, indicating that Wessberg was depressed, had insomnia, had poor concentration, struggled with recall, and lacked energy and stamina.  (AR 591.)

32.     Wessberg was not copied on Unum's communication with Dr. Tsai, nor on Dr. Tsai's response. (AR 545–47, 551–54.)

33.      In September 2019, following the providers' opinions, Unum sent a letter to Wessberg communicating its findings.  (AR 662.)  Unum informed Wessberg that Dr. Tsai no longer asserts restrictions or limitations from a chemotherapy treatment perspective.  (AR 662.)  Unum also informed Wessberg that the medical records provided by Dr. Berger indicate that her symptoms of depression and frequency of care supports ongoing LTD benefits through November 2019, but warned her that the Policy limits coverage based on mental health illnesses to 24 months—June 2019 to June 2021.  (AR 662.)

34.     In November 2019, Dr. Tsai updated Unum that Wessberg has been restricted from working for the last year because of her inability to perform physically strenuous activities.  (AR 703.)  Along with the update, the submitted treatment notes indicated that Wessberg was depressed, anxious, weak, experiencing dizziness, and reported instances of falling.  (AR 715.)

35.     During this time Wessberg continued to see Dr. Berger—eight visits over ten months—where she reported mental health concerns, dizziness, and fatigue.  (AR 1108,

1112, 1114, 1117, 1120, 1123, 1126, 1128, 4408–10.)  At Wessberg's last visit in 2019, Dr. Berger noted that as of December 2019, Wessberg's PHQ-9 test revealed her depression had worsened and she was severely depressed. (AR 1120–21.)  Although Adderall improved her energy and concentration, Wessberg was still depressed, had concentration issues, had short term memory issues, and was fatigued.  (AR 1120–21.)

36.     In November 2019, Wessberg also began seeing psychotherapist, Sarah Johnson, LICSW, for depression and anxiety.  (AR 1508.)  Dr. Johnson treated Wessberg 12 times over 7.5 months.  (AR 1508–09, 1512–17, 1522–24, 1530–31, 1554–55, 1576–79, 1595–601, 1662–63, 1948.)

## VI.   WESSBERG'S DISABILITY IN 2020 AND TERMINATION OF LONG-TERM DISABILITY BENEFITS

37.     On February 18, 2020, Wessberg had a follow up visit with Dr. Tsai, who examined Wessberg and concluded she had "[v]ertigo with negative cardiac and neurologic work up;" "[s]evere anxiety/depression;" "[s]evere physical weakness and deconditioning post chemotherapy;" and was "[u]nable to work at this time."  (AR 2073.) Dr. Tsai also noted that she would reassess Wessberg in three months.  (AR 2073.) Following the visit, Dr. Tsai referred Wessberg to her primary care provider, Courtney Messerly, M.D.  (AR 2073.)

38.     Shortly after Wessberg's follow up visit with Dr. Tsai, Wessberg saw Dr. Messerly.  Dr. Messerly examined Wessberg and noted Wessberg still experienced fatigue and dizziness following position changes, which had begun during her

chemotherapy and radiation therapy treatments. (AR 1526; *see also* AR 2481.) Dr. Messerly also noted that Wessberg had fallen several times. (AR 1526; *see also* AR 1340.)

39. On March 23, 2020, Wessberg returned to work part-time. (AR 819.) Wessberg's pay stubs from Fredrikson reflect that she worked around 10 hours per week: she was not paid for working any hours in March 2020, (AR 893), she was paid for working 10.3 hours in April 2020, (AR 879–80), she was paid for working 38.7 hours in May 2020, (AR 937–38), she was paid for working 22.9 hours in June 2020, (AR 1041–42), and she was paid for working 36 hours in July 2020, (AR 1026.)

40. Once Wessberg notified Unum she was working part-time, Unum again asked Dr. Tsai and Dr. Berger whether Wessberg was able to perform the occupation demands described in the vocational assessment full-time. (AR 837–42.) This vocational assessment included the same physical requirements as the previous assessment sent to Dr. Tsai and Dr. Berger; however, it now included the following cognitive requirements: "DIRECTING, controlling, or planning activities of others INFLUENCING people in their opinions, attitudes, and judgments Making JUDGMENTS and decisions Dealing with PEOPLE Performing a VARIETY of duties." (AR 612, 837–42.) Additionally, it omitted the identifier of "Attorney." (AR 837–42.) Wessberg was not copied on the communications sent to Dr. Tsai or Dr. Berger. (*See* AR 837–42.)

41. On April 27, 2020, Dr. Tsai responded that Wessberg was capable of working in her occupation full-time, (AR 856), despite having noted in her February 2020

treatment notes that Wessberg was unable to work, and that she would reevaluate Wessberg's ability to work in three months.  (AR 2073.)

42.      Unum summarized Dr. Tsai's response as "W[ork ]C[apacity ]N[arrative] Yes – F/T Sedentary," (AR 853, 858), and "agrees to f/t sedentary," (AR 911, 947).

43.      In May 2020, Wessberg was seen by Dr. Tsai's physician assistant, Melissa Peitz, PA, who noted similar symptoms as those from Wessberg's February 18, 2020 visit. (AR 2067–69.)  PA Pietz then referred Wessberg for another brain MRI to determine whether a brain metastasis was causing her dizziness.  (AR 2067.)  The MRI did not reveal why Wessberg had frequent dizziness.  (AR 1331.)

44.      Shortly after Wessberg's visit with PA Peitz, a medical assistant from Dr. Tsai's office followed up with Unum and clarified that Wessberg could work "no days longer than 6 hours and no stressful interactions and medium manual activity only."  (AR 929) (cleaned up).

45.      Following the MRI results, Wessberg was seen at the National Dizzy and Balance Center ("NDBC") in August 2020, where she underwent additional testing.  (AR 1302.)  The testing revealed abnormalities and Wessberg was diagnosed with peripheral vestibular disorder.  (AR 1302–06, 1311.)     Following her diagnosis, Wessberg was prescribed rehabilitation therapy.  (AR 2455.)  After eight vestibular therapy sessions, Wessberg discontinued the treatment because it worsened her symptoms.  (AR 2268, 2455.)

46.     On June 1, 2020, Dr. Berger finally responded to Unum's inquiry via the phone.  (AR 931.)  Dr. Berger said: "you know she had cancer and underwent chemo, she currently has chemo brain, her thought process is somewhat fuzzy and not always clear," and that he has no estimation as to when Wessberg will be able to return to work full-time.  (AR 931.)  Additionally, upon Unum's request, Dr. Berger indicated he would send the Work Capacity Narrative and updated treatment notes.  (AR 931.)

47.     Dr. Berger's conclusion that Wessberg has chemo brain was not new.  Dr. Berger had already twice connected Wessberg's symptoms to her chemotherapy treatment.  (AR 1114–15, 2413–14.)  In April 2019, Dr. Berger explained that Wessberg's symptoms of insomnia, racing thoughts, and anxiety were side effects of chemotherapy.  (AR 2413–14.)   In November 2019, Dr. Berger concluded that Wessberg's poor concentration, dizziness, and fatigue were "residual deficits from the chemotherapy, radiation and mastectomy."  (AR 2410–14.)

48.     Unum updated Wessberg on the status of her case, including Dr. Tsai's and Dr. Berger's opinions.  (AR 952–56.)  Unum also notified Wessberg that as of mid-July 2020, Unum had not received the documentation it requested from Dr. Berger.  (AR 952.)  Wessberg challenged Unum's findings and informed Unum that Dr. Berger would attest to her physical and mental restrictions/limitations, and Dr. Tsai would attest to her physical restrictions/limitations.  (AR 1035.)

49.     On July 16, 2020, Unum spoke with someone in Dr. Tsai's office who indicated Dr. Tsai was still of the opinion that "from an oncology standpoint [Wessberg] is fine to work on a full-time basis."  (AR 1053.)

50.     Despite the conflicting opinions from Dr. Tsai's office, Unum terminated its pending medical records request with Dr. Tsai's office.  (AR 1148.)

51.     On July 17, 2020, Unum's lead benefits specialist reviewed Wessberg's claim and made a recommendation.  (AR 1056–58, 1073.)  The specialist first noted that Dr. Tsai was not restricting Wessberg's work capabilities.  (AR 1057.)  The specialist acknowledged that Dr. Berger found Wessberg was unable to work full-time due to chemo brain, but because Dr. Berger had not submitted updated medical records to Unum, the disability specialist recommended terminating Wessberg's LTD benefits and closing the claim.  (AR 1057–58.)

52.     On July 20, 2020, Unum terminated Wessberg's LTD benefits.  (AR 1066.) Unum informed Wessberg that her LTD benefits were terminated because Dr. Tsai advised Unum that Wessberg is capable of performing the duties of her regular occupation on a full-time basis and Unum had not received the requested documentation from Dr. Berger.  (AR 1066–69.)

## VII.   THE RE-OPENING OF WESSBERG'S LONG-TERM DISABILITY BENEFITS DETERMINATION

53.     Following the termination of Wessberg's LTD benefits, on July 20, 2020, Dr. Berger sent Unum Wessberg's certification of disability and the missing Progress

Notes covering September 5, 2019 through June 1, 2020.  (AR 1092–130.)  Dr. Berger

informed Unum that "[Wessberg] does not have the mental or physical stamina to work

on a full-time basis yet.  She is still experiencing chronic fatigue and bouts of dizziness on

a daily basis.  These are exacerbated by the anxiety and depression that returned during

chemotherapy."  (AR 1098.)  The progress notes spanned a period of ten months and

indicated that Wessberg's depression had improved from "severe" to "moderate," and as

a result, Wessberg was able to concentrate more, had increased energy, and worried less.

(AR 1092–130.)  The notes also indicated Wessberg had intact associations and language

skills, logical thinking, and normal insight.  (AR 1128–29.)  However, the notes stated that

Wessberg was "having ongoing difficult[y] with doing legal work to the high level that she

was previously able to do," and "is not able to return to work full-time."  (AR 1129.)

54. In response to the documentation, Unum submitted Wessberg's Case

Progress Notes to three medical reviewers: Nurse Darlene Sturgeon, Dr. Stuart Shipko,

Psychiatrist, and Dr. Mark Schroeder, Psychiatrist.  The medical reviewers opined that

Wessberg was not precluded from working full-time.  (AR 1234–36, 1263–66, 1270–71.)

55. Following the medical reviewers' opinions, Unum informed Wessberg on

September 1, 2020, that Dr. Berger's records and certification of disability did not change

its decision to terminate her LTD benefits. (AR 1281–86.)  The letter informed Wessberg

that Unum's reviewing physicians agreed that "[g]iven the steady improvement and

[Wessberg's] sustained ability to work part time [she] would be currently capable of

**attempting** a return to work full time." (AR 1282) (emphasis added). Specifically, Unum's reviewing physicians concluded that Wessberg "can perform full-time duties of **Sedentary Work** on a full time basis." (AR 1283) (emphasis added). The reviewing physicians came to this conclusion because:

- Wessberg had been working 20 hours a week since March 23, 2020. (AR 1282.)

- Medical records show Wessberg's condition had improved since Wessberg's return to work part-time. (AR 1282.)

- Dr. Berger's notes were inadequate because he failed to make an independent evaluation of Wessberg's work capacity. (AR 1282.)

- Although Dr. Berger reported Wessberg suffered from impairing chronic fatigue and bouts of dizziness from her cancer treatment, Dr. Tsai indicated that Wessberg could work full-time. (AR 1282.)

- The intensity of Wessberg's treatment is inconsistent with an impairing psychiatric illness. (AR 1282.)

- No cognitive tests were performed. (AR 1282.)

- Wessberg's symptoms were not disruptive to other life activities. (AR 1283.)

56.    There are several issues with Unum's reasoning for terminating Wessberg's LTD benefits, including: (1) the medical reviewers' conclusions further indicate that Unum

focused overwhelmingly on Wessberg's occupation's physical demands, not the cognitive demands; (2) Unum misrepresented that Wessberg was working 20 hours per week when she was only working around 10 hours per week; and (3) as detailed later in this Order, several of the reported activities were inaccurate. *See infra* Section VIII ¶ 72.

57.    In September 2020, Wessberg submitted documentation supporting the re-opening of her LTD benefits claim.  This documentation included a narrative regarding the timeline of Wessberg's cancer and her treatment, (AR 1290–93), medical records documenting Wessberg's evaluation with NDBC, (AR 1294–322), and a note from Dr. McNiff, M.D., Family Medicine, excusing Wessberg from work from September 23, 2020, to October 23, 2020, for medical reasons.  (AR 2221.)  The medical reasons Dr. McNiff referred to were inner ear issues causing dizziness.  (AR 2248.)

58.    Wessberg also submitted documentation from her surgeon certifying that she could not work between July 27, 2020 and September 8, 2020, because she had recently undergone reconstructive surgery.  (AR 1323.)

59.    On October 2, 2020, Unum called Wessberg about her claim.  (AR 2242.) Unum's call records indicate that Wessberg acknowledged she was initially found disabled because of her breast cancer diagnosis.  (AR 2242.)  Now, however, she is unable to return to work full-time because of the "side effects from the chemo."  (AR 2242.)  Indeed, Wessberg informed Unum that she was working only a couple hours a day, five days a week.  (AR 2242.)  In addition to working part-time, Wessberg informed Unum that she

helps her youngest child with her virtual learning, she can take of her personal needs, she walks about a mile around the neighborhood each day, she has four children (ages 21, 18, 16, and 6), and her husband is a "stay at home Dad."  (2242–43.)

60.     On October 23, 2020, Unum informed Wessberg that the additional records and opinion of Dr. McNiff did not alter Unum's decision to terminate Wessberg's LTD benefits.  (AR 2276–77.)  Unum did extend Wessberg's LTD benefits through September 8, 2020, however, at the direction of her plastic surgeon.  (AR 2277.)

61.     Wessberg then submitted documentation saying she could not work full-time from October 22, 2020, through November 20, 2020.  (AR 2292.)  Unum declined to extend Wessberg's LTD benefits.  (AR 2312.)

## VIII.   WESSBERG APPEALS UNUM'S TERMINATION OF LONG-TERM DISABILITY BENEFITS

62.     Wessberg appealed Unum's decision on April 19, 2021.  (AR 2350.)

63.     In support of her appeal, Wessberg submitted several documents, including medical records confirming she had been seen by at least three physicians to address her continuing dizziness, fatigue, and brain fog:

- Karin Evan, M.D., otolaryngologist, suspected Wessberg suffered from vestibular nerve damage due to chemotherapy and referred her to a colleague, Dr. William Garvis, to confirm her hypothesis. (AR 2453–55.)

- Before seeing Dr. Garvis, Wessberg was evaluated by Yoon-Hee Cha, M.D., neurologist.  Dr. Cha ran several tests on Wessberg that came back normal

and then referred Wessberg to a vascular surgeon for possible decompression surgery. (AR 4627.) Dr. Cha also opined that Wessberg's "severe lightheadedness that can culminate in loss of consciousness . . . cognitive dysfunction and chronic fatigue" meant Wessberg could not work more than 20 hours per week. (AR 4719.)

- William Garvis, M.D., otolaryngologist, concluded Wessberg's dizziness was not a result of vestibular damage, but opined it could be orthostatic/cardiac and referred her to a cardiologist. (AR 2679.)

64. Unum's medical reviewers, Dr. Brown, M.D., Psychiatrist and Dr. Scott Norris, MD MPH, Family, Occupational, and Aerospace Medicine, evaluated Wessberg's newly submitted medical records to determine if she was incapable of working full-time as Wessberg's physicians asserted. (AR 4517, 4543.) The reviewers found Wessberg capable of working full-time, their reasoning largely the same as when Wessberg was initially found capable of working full-time: (1) Wessberg was able to work 20 to 30 hours per week; (2) Wessberg had not been treated for dizziness or falls; (3) Wessberg had not undergone any cognitive testing; (4) there is no data to explain Wessberg's symptoms; (5) medical evidence does not support that Wessberg cannot complete sedentary work; and (6) Wessberg participates in activities like homeschooling her daughter, running errands, exercising, traveling, and driving. (AR 4516–17, 4539–45.)

65.     Notably, as of 2021, however, neither Dr. Norris nor Dr. Brown had treated a patient in more than a decade.  *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 483–84 (E.D. Pa. 2021).   Additionally, neither physician ever spoke to or examined Wessberg, and neither physician specializes in oncology or cognitive disabilities.  (AR 4517, 4543.)  Moreover, several courts have found Dr. Norris's opinions not credible for varying reasons.  *Braun v. Unum Life Ins. Co. of Am.*, 22-1223, 2022 WL 17740459, at *2 (N.D. Ill. Dec. 16, 2022) (citing a dozen cases criticizing, rejecting, or giving little weight to Dr. Norris's opinions for different reasons).

66.     On July 14, 2021, Wessberg submitted a document detailing the duties of her occupation as a Trademark and Copyright attorney at Fredrikson.  (AR 4729.)  The duties include:

> - Researching existing trademarks to advise on availability.
> - Advising on issues of intellectual property, such as design and copyright, as well as trademarks.
> - Guiding clients through the legal aspects of introducing new products to the market.
> - Drawing up contracts and overseeing the trademark registration process.
> - Managing and protecting intellectual property rights once trademarks and designs have been registered.
> - Taking appropriate action if clients trademark rights are broken. This could involve negotiation or providing support to solicitors if the case reaches court.
> - Keeping up with trademark renewals.
> - Advising on the transfer of trademark and designs.

(AR 4730.)

67.    Unum considered the additional information, and relying on Dr. Norris's and Dr. Brown's opinions, initially denied Wessberg's appeal on July 19, 2021.  (AR 4734–42.) There is no indication that either Dr. Norris's or Dr. Brown's opinions accounted for Wessberg's July 14, 2021 document describing her occupation's duties.  When Unum denied Wessberg's appeal, it did not tell Wessberg what evidence she needed to submit to reinstate her LTD benefits.  (AR 4734–42.)

68.    Wessberg again submitted several medical documents supporting her disability.  Indeed, after being evaluated by three more physicians to address her continuing dizziness, fatigue, and brain fog, Wessberg finally had a definitive diagnosis:

- Robert Rea, M.D., cardiologist, in July 2021, ran several tests that came back abnormal.  (AR 4776.)  The test results "cinche[d] the diagnosis of a dysautonomia," thus explaining Wessberg's dizziness.  (AR 4776.)  In accordance with the test results, Dr. Rea then referred Wessberg to an autonomic neurologist.  (AR 4776.)

- Paola Sandroni, M.D., autonomic neurologist, in August 2021, examined Wessberg's dizziness, brain fog, and fatigue.  (AR 4791.)  With Dr. Rea's test results, Dr. Sandroni concluded there was evidence of neurogenic orthostatic hypotension.  (AR 4791.)  Dr. Sandroni found this could be caused by chemotherapy, which can damage the autonomic nervous system.  (AR

4791.)   Following her diagnosis, Dr. Sandroni prescribed Wessberg pyridostigmine.  (AR 4791.)

▪ Following Dr. Sandroni's conclusion that Wessberg suffered from neurogenic orthostatic hypotension, Dr. Tsai, oncologist, connected Wessberg's symptoms to the neurotoxic side effects of chemotherapy and concluded that Wessberg could not work full-time:

> Ann remains under my care for her breast cancer. She is on treatment with Anastrozole and has no active cancer. Unfortunately, as a result of her prior chemotherapy, she has chronic fatigue, autonomic dysfunction, orthostatic hypofunction and cognitive impairment that impacts her memory and concentration. She cannot work a full day. She requires extra sleep. She requires extra time to achieve previously easy tasks. In my opinion, she can no longer work full time.

(AR 4794.)

69.   Ultimately, Dr. Tsai's diagnosis connected Wessberg's symptoms of chronic fatigue, autonomic dysfunction,[2] orthostatic hypotension (or hypofunction),[3] and

---

[2]   Autonomic dysfunction is when the autonomic nervous system does not function correctly.  "The autonomic nervous system (ANS) is a subcomponent of the peripheral nervous system (PNS) that regulates involuntary physiologic processes, including blood pressure, heart rate, respiration, digestion, and sexual arousal."  Juan Carlos Sánchez-Manso et al., Autonomic Dysfunction, National Library of Medicine (last updated Aug. 4, 2023), https://www.ncbi.nlm.nih.gov/books/NBK430888.

[3]   Orthostatic hypotension is a drop in blood pressure that can cause dizziness, lightheadedness, and fainting. Matthew Ringer & Sarah L. Lappin, Orthostatic Hypotension, National Library of Medicine (last updated May 16, 2023), https://www.ncbi.nlm.nih.gov/books/NBK448192.

cognitive impairment impacting her memory and concentration, to the neurotoxic side effects of the chemotherapy Wessberg underwent in 2019 to treat her breast cancer.  (AR 4794.)

70.    Dr. Norris reviewed the documentation outlining the three physicians' notes and evaluations and provided Unum his opinion.  (AR 4813–14.)   Relying on Dr. Norris's review, Unum ultimately concluded, in a final denial letter dated October 1, 2021, that its determination remained unchanged.  (AR 4823–26.)   In the final denial letter, Unum explained why it concluded that Wessberg was no longer disabled.  (AR 4824–25.)  Unum's explanation appears to be based largely on Dr. Norris's review of the records.  (AR 4824.)

71.    Unum explained why it concluded Wessberg's reported symptoms were insufficient to demonstrate an existing disability.  (AR 4824–25.)  It found Wessberg was not disabled because (1) the recent cardiology evaluation performed by Dr. Rea in July 2021 and neurology evaluations performed by Dr. Sandroni in August 2021, and the autonomic testing referenced in the notes, are "not time-relevant" to whether Wessberg was disabled as of September 8, 2020, (2) Wessberg's reported activities of working 20 hours per week as an attorney, driving, exercising, acting as the primary caregiver for her children, assisting her children with schooling, and traveling are not consistent with her reported symptoms of frequent, unpredictable and impairing presyncope/syncope

symptoms[4] and pervasive cognitive impairment, (3) Wessberg's examinations were inconsistent with her reported symptoms because she did not present to medical providers with fall-related injuries, her physicians did not advise her to refrain from driving or swimming, (4) Wessberg was not referred for formal neurocognitive testing, (5) Dr. Tsai's, Dr. Karam's, and Dr. Cha's opinions are not supported by Wessberg's reported activities and the limited diagnostic findings, and (6) Dr. Tsai's change of opinion in August 2021 was unaccompanied by clinical data to support her statement, and the records from the other specialists did not support impairing symptoms related to dysautonomia (autonomic dysfunction), orthostatic hypotension, syncope/pre-syncope, or cognitive deficits.  (AR 4824–25.)

72.     In reaching its conclusion, Unum relied on the medical reviewers' opinions, which were partially based on inaccurate facts.  For instance, Wessberg was not working 20 hours per week as an attorney, instead, she was working closer to 10 to 15 hours per week.  (AR 1128.)  Wessberg was not the primary caregiver of her children.  In fact, Wessberg's husband is a "stay at home dad" who helps with the kids.  (AR 2243.)  Additionally, Wessberg did not home school her youngest child.  Rather, she helped her daughter with virtual learning by answering questions and reminding her to log into

---

[4] Syncope is another word for fainting or passing out.  James D. Whitledge et al., Presyncope, National Library of Medicine (last updated July 17, 2023), https://www.ncbi.nlm.nih .gov/books/NBK459383.  Presyncope is the feeling that you are about to faint or pass out without actual loss of consciousness.  *Id.*  An individual experiencing presyncope may be lightheaded or nauseated.  *Id.*

distance learning that was mandated during the COVID-19 pandemic.  (AR 4723.)  Finally, Wessberg did report fall-related injuries.  (AR 1337, 1341.)

73.     Wessberg's neighbor submitted a written statement in July 2021 that generally corroborates Wessberg's reported instances of falling or fainting.  (AR 4722.) Additionally, Wessberg's husband witnessed Wessberg fall multiple times.  (AR 4526.)

**IX.     OTHER FINDINGS OF FACT**

74.     The Court takes judicial notice that the height of the COVID-19 pandemic was in the years 2020 and 2021.[5]  Fed. R. Evid. 201(c)(1); *see Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (recognizing authority to take judicial notice of government websites); *e.g.*, *In re RFC and ResCap Liquidating Tr. Action*, 444 F. Supp. 3d 967, 969 & n.1 (D. Minn. 2020) (taking judicial notice of COVID-19 data from the CDC).

75.     The Court did not find evidence that any provider who personally examined Wessberg stated they believed she was unreliably reporting her symptoms, her self-reported symptoms lacked credibility, or that Wessberg was engaging in symptom magnification.

76.     Unum never required Wessberg to submit to an independent medical evaluation, despite the Policy allowing so. (AR 206.)

---

[5] Meredith S. Shiels, COVID-19 Was Third Leading Cause of Death in the United States in Both 2020 and 2021, National Institutes of Health, https://www.nih.gov/news-events/news-releases/covid-19-was-third-leading-cause-death-united-states-both-2020-2021.

77.     Unum's medical reviewers never referred Wessberg for cognitive testing, despite the Policy allowing so.  (AR 206.)

78.     Based on the evidence in the Administrative Record, other than Dr. Tsai's conflicting opinions, no medical professional who personally examined Wessberg cleared her to work full-time.

79.     Wessberg was initially found disabled because of her breast cancer.  (AR 315.)  As of September 2019, however, Unum extended Wessberg's LTD benefits upon finding her disabled based on her mental health symptoms.  (AR 662.)

80.     Wessberg contested her job description by at least July 14, 2021.  (AR 4729–30.)

81.     Dr. Berger has treated Wessberg for anxiety and depression since 2013.  (AR 1596.)

82.     Unum did not present any evidence contradicting Wessberg's symptoms.

## X.     PROCEDURAL HISTORY

83.     After Unum denied Wessberg's appeal, Wessberg filed this ERISA action. (Compl.)

84.     At the Court's direction, the parties filed cross motions for judgment on the administrative record under Federal Rules of Civil Procedure 39(b) and 52(a).  (Pl.'s Mot. J. on the R., Jan. 8, 2024, Docket No. 63; Def.'s Mot. J. on Admin. R., Jan. 8, 2024, Docket No. 60.)  Unum also filed the Administrative Record as a sealed exhibit on which both parties rely.  (Decl. of Katherine Durrell, Sealed Ex. ("AR"), Mar. 10, 2023, Docket No. 47.)

85.     The Court held a hearing on the Motions on May 1, 2024.

**CONCLUSIONS OF LAW**

**I.      STANDARD OF REVIEW**

1.      ERISA allows a participant in an ERISA-regulated plan to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

2.      The Court's review of plan determinations is *de novo* unless the plan grants discretionary authority to the plan administrator. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–15 (1989); *accord Johnson v. U.S. Bancorp Broad-Based Change In Control Severance Pay Program*, 424 F.3d 734, 738 (8th Cir. 2005). As the parties agree, the plan here does not give Unum discretionary authority, and the Court reviews Unum's determination *de novo*. (Def.'s Mem. Supp. Mot. J. on Admin. R. ("Def.'s Supp. Mem.") at 26, Jan. 8, 2024, Docket No. 62; Pl.'s Mem. Supp. Mot. J. on R. ("Pl.'s Supp. Mem.") at 33, Jan. 8, 2024, Docket No. 65.) Therefore, the Court gives no deference to Unum's decision. *See Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1095 (8th Cir. 1992). This applies to both issues of plan interpretation and fact-based determinations. *Riedl v. Gen. Am. Life Ins. Co.*, 248 F.3d 753, 756 (8th Cir. 2001).

3.      It is undisputed that Wessberg bears the burden of proving by a preponderance of the evidence that she is entitled to payment of LTD benefits past September 8, 2020, within the meaning of the Policy. *See Farley v. Benefit Tr. Life Ins. Co.*,

979 F.2d 653, 658 (8ᵗʰ Cir. 1992); (*see also* Def.'s Supp. Mem. at 29; Pl.'s Supp. Mem. at 33.)

4.      Because the parties have expressly asked for a ruling under Federal Rules of Civil Procedure 39(b) and 52(a)(1), the Court acts as a factfinder and may resolve factual disputes, make credibility determinations, and weigh the evidence.  *See Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1026 (8ᵗʰ Cir. 2021); *Chapman v. Unum Life Ins. Co. of Am.*, 555 F. Supp. 3d 713, 716 (D. Minn. 2021).

## II.    RECORD EVIDENCE

5.      It is undisputed that the Court may rely on Unum's administrative record that is filed with the Court.  *Avenoso*, 19 F.4th at 1025; (*see also* Def.'s Supp. Mem. at 1; Pl.'s Supp. Mem. at 3.)

## III.   ANALYSIS

### A.    Disability Determination

6.      Unum determined that Wessberg was no longer disabled as of September 8, 2020.  Wessberg challenges this determination.  Therefore, the Court must determine whether Wessberg was still disabled as of that date, not whether she remained disabled beyond that time.

7.      When reviewing an ERISA plan administrator's decision *de novo*, the Court begins by examining the language of the plan documents.  *Kitterman v. Coventry Health Care of Iowa, Inc.*, 632 F.3d 445, 448 (8ᵗʰ Cir. 2011).  The Court interprets the terms of the plan documents "by giving the language its common and ordinary meaning as a

reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean" and by reading each provision consistently with the plan as an integrated whole.  *Id.* (quoting *Adams v. Cont'l Cas. Co.*, 364 F.3d 952, 954 (8th Cir. 2004)).

8.     The Policy indicates that a claimant is disabled if they are limited from performing at least **one** of the material and substantial duties of their occupation due to the sickness or injury.  This requires the Court to look at the combination of all limitations caused by the sickness or injury in making a disability determination.  Even if no single impairment or symptom is disabling, the claimant may be disabled if multiple impairments collectively prevent the performance of a material or substantial work duty.

9.     After carefully reviewing the entire record, the Court finds the preponderance of the evidence demonstrates that Wessberg was disabled as of September 8, 2020, based on her cognitive impairments.

10.     When Unum initially approved Wessberg's claim for LTD benefits in February 2019, it based its decision on Wessberg's inability to complete the material and substantial duties of her occupation because of her recent breast cancer diagnosis.  In September 2019, however, Unum determined that Wessberg was no longer disabled due to her breast cancer diagnosis.  Unum based its decision solely on Dr. Tsai's opinion that Wessberg was no longer disabled from a chemotherapy or cancer treatment perspective.  Rather than terminate Wessberg's LTD benefits at this point, however, Unum extended

Wessberg's benefits based on her mental health disability which was substantiated by Dr. Berger's documentation.

11.     Because Unum first found Wessberg was disabled based on her breast cancer diagnosis and then because of her mental health, Unum did not engage with Wessberg's claims that she was disabled on a different basis—cognitive impairment. Unum's failure to consider Wessberg's cognitive impairment was not due to Wessberg failing to submit evidence supporting her claim of a cognitive disability.   Indeed, throughout 2020 and 2021, Wessberg consistently provided Unum with evidence substantiating her reports of cognitive impairment symptoms.

12.     For instance, in March 2019 Wessberg reported to her oncology provider that she was experiencing vertigo/dizziness and fatigue.  In May 2019 she reported to her mental health provider that she struggled with concentration and memory, was fatigued and tired, and had decreased stamina.   In February 2020 Wessberg reported to her oncology provider and primary care provider that she was experiencing vertigo, fatigue, and dizziness.  And in May 2020 Wessberg was still reporting dizziness, so much so that she was referred for another brain MRI to determine whether a brain metastasis was causing the dizziness.   Because the MRI did not reveal why Wessberg had frequent dizziness, Wessberg's provider referred her to the NDBC, where testing ultimately resulted in a diagnosis of peripheral vestibular disorder.  This diagnosis and subsequent treatment, however, did not solve Wessberg's dizziness.

13.     Despite Wessberg's consistent reports and medical records documenting her symptoms and testing, Unum did not fully consider whether Wessberg was disabled based on cognitive impairment.   Rather than engaging with Wessberg's cognitive impairment, Unum focused on Wessberg's physical capabilities.   There are several instances in the record to support this finding.   First, the occupation description that Unum provided to Wessberg's providers completely omitted cognitive demands.  Second, in response to Dr. Tsai's assessment of Wessberg, Unum repeatedly documented that Wessberg was able to work a sedentary position full-time, with no mention of her ability to perform the position's cognitive demands.   Third, in re-opening Wessberg's claim, Unum enlisted several board-certified psychiatrists, a nurse, and a family medicine physician to review Wessberg's claim, not an oncologist, neurologist, or cognitive therapist.   Fourth, in declining to reinstate Wessberg's LTD benefits, Unum noted that Wessberg's mental health treatment was inconsistent with an impairing psychiatric illness.[6]   Finally, Unum documented that Wessberg's medical records indicated her mental health condition had improved since she returned to work part-time.

14.     Unum contends that Wessberg's evidence of a cognitive disability is insufficient on several bases.   First, Unum argues that Wessberg's self-reported symptoms, which it characterizes as "subjective evidence," are insufficient to support a

---

[6] Although the Court does not find it necessary to determine whether Wessberg's mental health treatment was consistent with a mental health disability, the Court notes that access to medical treatment may have been impacted by COVID-19.

finding that she is disabled.  While it is true that Wessberg primarily relied on self-reported symptoms to prove her disability, the Policy does not prohibit the consideration of self-reported symptoms.  Additionally, the Court can consider credible self-reported symptoms.  *See Avenoso*, 19 F.4th at 1027–28; *Proctor v. Unum Life Ins. Co. of Am.*, No. 20-2472, 2022 WL 4585278, at *14–15 (D. Minn. Sept. 29, 2022).  When determining the credibility of self-reported symptoms, the Court considers consistency of reporting, supporting physician's evaluations, whether any provider who conducted an in-person evaluation questioned the credibility of the self-reported symptoms, and other corroborating reports of the symptoms. *Proctor*, 2022 WL 4585278, at *14.  Each of these factors are present in this case and support a finding that Wessberg's self-reported symptoms are credible.  As concluded above, Wessberg consistently reported her symptoms.  Numerous providers examined Wessberg over a two-year period, and crucially, nothing in the record indicates that any of them questioned her reported symptoms or questioned whether they lacked credibility.  Additionally, Wessberg's reported symptoms are corroborated by her voluminous medical records consistently documenting her symptoms and by reports of her husband and her neighbor who witnessed Wessberg fall due to fainting and dizziness.

15.     The court is also persuaded that the providers who evaluated Wessberg are better positioned to assess the credibility of her "subjective" symptoms than Unum's reviewers who never examined Wessberg. *See Kaminski v. Unum Life Ins. Co. of Am.*, 517

F. Supp. 3d 825, 862 (D. Minn. 2021).  While plan administrators need not automatically afford greater weight to the opinions of treating physicians over reviewing physicians, courts have indicated that treating physicians who make in-person observations may be in the best position to assess a claimant's condition.  *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001); *Kaminski*, 517 F. Supp. 3d at 862; *Proctor*, 2022 WL 4585278, at *15.  Additionally, courts have considered whether the reviewing physician had "relevant expertise."  *See Kaminski*, 517 F. Supp. 3d at 864; *see also* 29 C.F.R. § 2560.503-1(h)(3)(iii) (requiring ERISA administrators to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment").

16.     Wessberg had more than a dozen physicians examine her over a two-year period, all of whom came to the same conclusion: she was experiencing symptoms that impaired her cognitive abilities.  These physicians were experts in the kinds of medical specialties relevant to Wessberg's condition, including oncology, otolaryngology, neurology, cardiology, and autonomic neurology, and they ran numerous tests on Wessberg.  Unum, on the other hand, had nurses, psychiatrists, and general medicine physicians review Wessberg's file.  Notably, none of Unum's medical reviewers referred Wessberg for testing of any kind.

17.     Furthermore, Unum's argument that Wessberg's self-reported symptoms are insufficient is refuted by its consideration of Wessberg's self-reported symptoms

when it re-evaluated her disability in September 2019 and found, based on her mental health, that she was still disabled under the terms of the Policy. *See Roehr v. Sun Life Assurance Co. of Can.*, 21 F.4th 519, 526 (8th Cir. 2021) ("[A] plan administrator's reliance on the same evidence to both find a disability and later discredit that disability does not amount to a reliance on 'substantial evidence.'").   When Unum determined that Wessberg was disabled due to her mental health, Unum based that decision in part on Dr. Berger's treatment notes which largely document Wessberg's self-reported "depressive symptoms," including sadness, loss of concentration, fatigue, and poor memory.  (AR 591.)  The only "objective" evidence, in Unum's words, upon which Unum based its decision were Dr. Berger's observations, which were few.  Therefore, Unum's argument is weakened by the fact that it relied on the same kind of evidence to extend LTD benefits that it now argues is insufficient.

18.     One of Unum's primary reasons for denying reinstatement of Wessberg's LTD benefits was because her activities—working 20 hours a week, driving, exercising, acting as a primary caregiver of her children, and traveling—were inconsistent with her reports of "frequent, unpredictable and impairing presyncope/syncope symptoms and pervasive cognitive impairment."  (AR 4824–25.)   There are two issues with Unum's reliance on this reason.  First, Unum's characterizations of Wessberg's activities are not entirely accurate.  *See supra* Section VIII ¶ 72.  Second, although Unum can rely on a medical reviewer's opinion, it must consider "whether the [reviewer's] conclusions follow

logically from the underlying medical evidence." *Willcox v. Liberty Life Assurance Co. of Bos.*, 552 F.3d 693, 700–01 (8th Cir. 2009) (citation omitted).  While Wessberg engages in some life activities, her activities are not necessarily inconsistent with her reported symptoms.  Setting aside Wessberg's ability to work 10 to 15 hours, which does not equate to being capable of working full-time, her other activities are entirely unrelated to the cognitive demands of Wessberg's occupation as an attorney, particularly assisting her six-year-old with homework, traveling, driving, and exercising.  To the extent that driving and exercising are inconsistent with Wessberg's symptoms of fainting and dizziness, the record presents no information on the manner or extent to which Wessberg engages in these activities or whether she is accompanied by other individuals.  Moreover, and crucially, none of Wessberg's reported activities clearly indicate that she can complete all the material and substantial duties of an attorney on a full-time basis.

19.    Unum also repeatedly found it notable that Wessberg could not corroborate her disabling symptoms with an abnormal test result.  However, after seeing almost a dozen physicians, Wessberg eventually provided Unum with medical records diagnosing her with neurogenic orthostatic hypotension, which was later determined to be caused by the neurotic side effects of chemotherapy.  Despite finally having a definitive diagnosis supported by test results, Unum found that such testing was "not time-relevant to Ms. Wessberg's functional status as of September 8, 2020."  (AR 4824.)  However, test results that were developed after the termination of benefits are relevant if the results

connect the pre-termination disability to the eventual diagnosis. *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1162 (8th Cir. 1998). The autonomic test results by Dr. Sandroni in August 2021 diagnosed Wessberg with neurogenic orthostatic hypotension, which Dr. Tsai later determined was caused by the neurotic side effects of chemotherapy. These test results are clearly relevant to Wessberg's disability as of September 8, 2020, because they tie her symptoms back to her previous chemotherapy treatment. Additionally, the Policy allows Wessberg to submit information not presented or available at Unum's initial disability determination, and Unum will consider it. Accordingly, Unum erred by failing to consider these test results.

20.     Unum's medical reviewers also found it significant that Wessberg did not submit to neurocognitive testing. Although this is true, Wessberg did submit to numerous other tests as directed by her many physicians. And, notably, Unum's medical reviewers could have referred Wessberg for neurocognitive testing but did not.

21.     Wessberg argues that the medical reviewers' opinions were insufficient bases on which to terminate her LTD benefits because they are based on a vague and generic description of Wessberg's occupation that did not accurately identify the material and substantial duties of her job as a shareholder attorney at Fredrikson. In *Darvell*, the Eighth Circuit considered whether it was reasonable for the insurer to define the claimant's occupation using DOT rather than the claimant's specific position when the plan required the claimant to demonstrate that they were "unable to perform all the

material duties of his or her regular occupation." *Darvell v. Life Ins. Co. of N. Am.*, 597 F.3d 929, 933 (8th Cir. 2010). The court concluded that it was reasonable for the insurer to interpret "regular occupation" as requiring consideration of the claimant's general occupation, instead of their specific position, because the plan did not define "regular occupation." *Id.* at 935–36; *see also Jalowiec v. Aetna Life Ins. Co.*, 155 F. Supp. 3d 915, 940 (D. Minn. 2015) (applying *Darvell*).

22. Here, the Policy's language is almost identical to the plan's language in *Darvell*, requiring Wessberg to demonstrate that she is unable to perform the material and substantial duties of her "regular occupation" due to her disability. (AR 214.) The Policy defines regular occupation as a "vocation that involves material and substantial duties of the same general character as the occupation you are regularly performing for your Employer . . . [Unum is] not limited to looking at the way you perform your job for your Employer, but [Unum] may also look at the way the occupation is generally performed in the local economy." (AR 232.) Accordingly, Unum reasonably interpreted the Policy to require consideration of Wessberg's occupation as it existed in the national economy (using e-DOT) and not particularized to her job at Fredrikson. However, Unum was required to properly categorize and describe Wessberg's occupation with the evidence available, which it failed to do. *See Jalowiec*, 155 F. Supp. 3d at 940.

23. Unum created two different occupational descriptions to elicit physician opinions. For the first description, like in *Darvell*, Unum properly used e-DOT to define

Wessberg's occupation as "Attorney" and identify the cognitive and physical requirements. (AR 537.) Unum identified the cognitive requirements as "advising, consulting, litigating, and performing legal work or trial work, and carr[ying] out the legal processes necessary to effect the rights, privileges, and obligations of the organization." (AR 537.) However, when sending the initial description to Wessberg's providers to assess her ability to work full-time, Unum did not include the cognitive requirements, which are undoubtedly relevant because Wessberg is claiming cognitive impairment.

24.     The second occupational description used by Unum did list cognitive requirements, but the requirements were not specific to "Attorney" like those that are found in e-DOT. Indeed, the cognitive requirements of an "Attorney" as identified in the second description include directing, controlling, planning activities of others, influencing people, making judgments, dealing with people, and performing a variety or duties. (AR 612.) These e-DOT cognitive requirements describe a host of occupations, including a call center supervisor, *Proctor*, 2022 WL 4585278, at *2, and a facilities technician, *Perez v. Unum Life Ins. Co. of Am.*, 21-3207, 2022 WL 6173217, at *6–7 (N.D. Cal. Oct. 7, 2022).

25.     As this generic description of cognitive demands applies to several non-related occupations, it was hardly sufficient to determine whether Wessberg could complete the material and substantial duties of her occupation. Not only were the demands described more generic than Wessberg's specific duties as an attorney, of which Unum was aware, but also more generic than the demands in the e-DOT description that

Unum previously used and then discarded.  No attorney could feasibly argue that directing, controlling, planning the activities of others, influencing people, making judgments, and dealing with people adequately describes what is cognitively required of an attorney.  This is especially true when, as here, another description exists that lists the duties of an attorney as "advising, consulting, litigating, and performing legal work or trial work."  (AR 537.)

26.     Unum's descriptions of Wessberg's occupation were insufficient to elicit reliable medical opinions regarding her ability to perform the material and substantial duties of her occupation as a full-time attorney.  At a minimum, Unum should have used the e-DOT occupational description and included both the cognitive and the physical requirements when it was eliciting provider opinions regarding Wessberg's functional capabilities.

27.     In addition to relying on the opinions of medical reviewers and physicians—which were based on an inaccurate occupational description of Wessberg's job, Unum improperly relied on Dr. Tsai's inconsistent opinions.  In February 2020, Dr. Tsai first concluded that Wessberg was unable to work at all and that she would re-assess her condition in three months.  Then, just two months later, Dr. Tsai switched her position and informed Unum that Wessberg could work full-time.  One month later, Dr. Tsai again changed her opinion and clarified that Wessberg should not work more than six hours a day, should avoid stressful interactions, and was restrained to medium manual activity.

And finally, in July 2020, in response to another of Unum's inquiries, Dr. Tsai indicated that from an oncology medical standpoint Wessberg was fine and able to work full-time. Despite Dr. Tsai's conflicting opinions, Unum never reached out to clarify whether Wessberg was able to work full-time. In fact, Unum canceled its records request with Dr. Tsai's office.

28.     Another consideration that supports finding that Wessberg was disabled as of September 8, 2020, is that this is a termination of benefits case. In a termination of benefits case, "unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002). "This does not shift the burden to Unum; it is instead just a consideration." *Proctor*, 2022 WL 4585278, at *16. While Wessberg's mental health certainly may have improved, which was the basis of extending her LTD benefits, the record plainly shows that she suffered from cognitive impairments as well. And there is no evidence that Wessberg's cognitive impairments, which impacted her ability to work full-time, improved in any way when Unum terminated her LTD benefits.

29.     Finally, Unum's medical reviewers consistently found that because Wessberg was able to work part-time as an attorney, she could **attempt** to work full-time as an attorney. However, there is no reason to believe that an individual can or could attempt to work full-time merely because they can work part-time. There is a significant

difference in an individual's ability to work 10 to 15 hours a week versus 40 hours a week—or 60 hours a week in Wessberg's case.

30.     In sum, Unum terminated Wessberg's LTD benefits based on its medical reviewers' opinions, which relied on an insufficient occupational description, several inaccurate facts, and largely one physician's inconsistent opinions.  Most significantly, Unum and its medical reviewers repeatedly failed to engage with Wessberg's cognitive disability; instead, they attributed Wessberg's cognitive symptoms to her mental health disorder without considering whether a cognitive impairment was present as well. Although Unum may be correct that Wessberg was not disabled by a mental health disorder, Wessberg presented sufficient evidence throughout the administrative review process to establish that she was cognitively impaired.  Unum had a duty to engage with Wessberg's evidence and make an adequate determination of whether Wessberg was disabled; its failure to do so was erroneous.

31.     Additionally, Unum was required to identify and request additional information if it believed it needed more information to make a reasoned decision. *Chorosevic v. MetLife Choices*, 600 F.3d 934, 944 (8th Cir. 2010).  Unum failed to do so.

32.     Ultimately, in concluding whether Wessberg was disabled on September 8, 2020, the Court must determine whether she could perform all the material and substantial duties of her occupation as an attorney.  An attorney's cognitive demands, as the e-DOT definition states, include "advising, consulting, litigating and performing legal

work or trial work, and carr[ying] out the legal processes necessary to effect the rights, privileges, and obligations of the organization." (AR 537.) The record indicates that when Unum terminated her LTD benefits, Wessberg was extremely fatigued, experiencing dizziness and vertigo, struggling with concentration, and fainting. These symptoms, as Wessberg's physicians opined, demonstrate by a preponderance of the evidence that Wessberg could not have completed the material and substantial duties of her regular occupation as of September 8, 2020.

33.    Because Wessberg has proven she could not have completed the material and substantial duties of her regular occupation, Wessberg was disabled as of September 8, 2020 under the Policy. Therefore, the Court concludes that Unum improperly terminated Wessberg's LTD benefits.

### B.    Award of Long-Term Disability Benefits

34.    Wessberg asks the Court to reinstate her LTD benefits and require Unum to pay retroactive benefits to Wessberg from September 8, 2020. In ERISA actions, the Court may clarify "rights to future benefits under the terms of the plan," meaning that it is authorized to issue orders related to future payments, not just back-benefits. *See* 29 U.S.C. § 1132(a)(1)(B); *Welsh v. Burlington N., Inc., Emp. Benefits Plan*, 54 F.3d 1331, 1339–40 (8th Cir. 1995).

35.    Because Wessberg does not have an ongoing duty to prove her disability, the Court will order Unum to pay retroactive benefits to Wessberg from September 8,

2020, and reinstate Wessberg's LTD benefits until Unum determines that Wessberg is not disabled under the Policy.

### C.   Attorney's Fees and Costs

36.   Because the Court finds that Unum improperly terminated Wessberg's benefits, the Court must determine whether to award Wessberg attorney's fees and costs.

37.   ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  Although the decision to award attorney's fees and costs is discretionary, a court should "apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts."  *Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006) (quoting *Welsh*, 54 F.3d at 1342).  "Therefore, although there is no presumption in favor of attorney fees in an ERISA action, a prevailing plaintiff rarely fails to receive fees."  *Id.* at 1040–41.

38.   The Eighth Circuit has provided a list of five non-exclusive factors for courts to consider:

> (1) the degree of the opposing parties' culpability or bad faith;
> (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal qeUstion [sic] regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8th Cir. 1984); *accord Starr*, 461 F.3d at 1041.

The factors are general guidelines, *Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966, 972 (8th Cir. 2002) (en banc), and no one factor is dispositive, *see Starr*, 461 F.3d at 1041.

39.    The Court will award Wessberg reasonable attorney's fees and costs. Although there is no indication that Unum acted in bad faith, it failed to exercise the care required of it throughout the administrative process.   Unum's main explanation for terminating Wessberg's LTD benefits was that Wessberg's self-reported symptoms were insufficient to establish a disability under the Policy.   This, however, is inconsistent with the Policy, which does not preclude a consideration of self-reported symptoms.   Further, Unum based its decision to extend Wessberg's LTD benefits in part on the self-reported symptoms.   Moreover, although Unum asserted that Wessberg's activities were inconsistent with her reported symptoms, many of the activities cited by the medical reviewers were inaccurate, and Unum never properly explained how the activities were relevant to the material and substantial duties of an attorney.   Nor did Unum explain why its medical reviewers' opinions—who did not personally examine Wessberg—were more reliable than those of Wessberg's providers who personally examined her, consistently opined that she was disabled, and never questioned the credibility of her self-reported symptoms.

40.    An award of attorney's fees is also consistent with ERISA's remedial nature. *Starr*, 461 F.3d at 1041.   Failing to award attorney's fees here may deter future claimants

with meritorious claims from vindicating their rights.  *Id.*  Similarly, awarding attorney's fees will deter administrators from mishandling claims with similar records.  Moreover, there is no indication that Unum is unable to pay attorney's fees.  *See e.g.*, *Kaminski*, 517 F. Supp. 3d at 869 (finding Unum able to pay attorney's fees).  Accordingly, the Court will award attorney's fees to Wessberg.

41.    Before the Court can make a final award of attorney's fees, however, Wessberg must submit an affidavit supporting her reasonable attorney's fees and costs. The parties are also required to meet and confer to attempt to resolve any differences on the reasonableness of the fees and costs before Wessberg files the affidavit.

### D.    Prejudgment Interest

42.    Wessberg also seeks prejudgment interest on the award of past due LTD benefits.

43.    Although ERISA does not expressly provide for prejudgment interest, prejudgment interest awards are permitted by 29 U.S.C. § 1132(a)(3)(B) which allows a court to award "other appropriate equitable relief" in ERISA cases.  *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1006 (8th Cir. 2004).  Courts have discretion to award prejudgment interest.  *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1330 (8th Cir. 1995). Awarding prejudgment interest is appropriate unless "exceptional or unusual circumstances exist making the award of interest inequitable."  *Id.* (citation omitted).  The main purpose of such an award is to compensate the prevailing party and to prevent a

wrongdoer's unjust enrichment. *Christianson v. Poly-Am., Inc. Med. Benefit Plan*, 412 F.3d 935, 941 (8th Cir. 2005).

44.    Because the Court finds that Unum improperly terminated Wessberg's LTD benefits and there are no exceptional or unusual circumstances, an award of prejudgment interest is appropriate.

45.    Before calculating the award of prejudgment interest, Wessberg must submit an affidavit calculating her past due LTD benefits from September 8, 2020 through the present.  Additionally, the parties must meet and confer to attempt to resolve any differences on the appropriate prejudgment interest rate before Wessberg files an affidavit.  If the parties do not agree to a prejudgment rate, the parties must submit briefs to the Court with their positions on the appropriate rate.

### ORDER FOR JUDGMENT

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED AND DECLARED** that:

1.  Defendant's Motion for Judgment on the Administrative Record [Docket No. 60] is **DENIED**;

2.  Plaintiff's Motion for Judgment on the Administrative Record [Docket No. 63] is **GRANTED**;

3.  Defendant is ordered to reinstate Plaintiff's long-term disability benefits;

4. Defendant is ordered to pay Plaintiff damages in the amount of all her unpaid long-term disability benefits from the date of termination to the present, in an amount to be determined;

5. Plaintiff's request for reasonable attorney's fees, costs, and prejudgment interest is **GRANTED**;

6. The parties are ordered to meet and confer to discuss the amount of long-term disability benefits owed, the reasonableness of Plaintiff's attorney's fees and costs, and the proper calculation of prejudgment interest;

7. If the parties agree on the amount of attorney's fees and costs and prejudgment interest, the parties shall submit a joint proposed judgment within twenty-eight (28) days after entry of this Order; and

8. If the parties disagree:

   a. Plaintiff shall submit an affidavit substantiating her attorney's fees and costs incurred in this matter and a brief explaining her positions on the benefits owed and on prejudgment interest including calculating the interest owed within twenty-eight (28) days after entry of this Order; and

   b. Defendant may submit a response to Plaintiff's attorney's fees and costs affidavit and a brief explaining its positions on the benefits owed and on

prejudgment interest including calculating the interest owed within

fourteen (14) days after Plaintiff submits her filings.

DATED: July 15, 2024                         _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                              United States District Judge